HAROLD WARREN RACHIELL, Petitioner and Appellant, Ex Parte; PEOPLE OF PUERTO RICO, Intervener and Appellee.

No. R-64-190.     Decided April 23, 1965.

*Felipe González Vergara* for appellant. *J. B. Fernández Badillo,* Solicitor General, and *Elpidio Arcaya, Assistant Solicitor General,* for intervener.

Division composed of Mr. Acting Chief Justice Pérez Pimentel, Mr. Justice Blanco Lugo, and Mr. Justice Ramírez Bages.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

Appellant Harold Warren Rachiell appeared before the Superior Court, Ponce Part, requesting authorization to adopt Mark Roger Des Jarlais, son of petitioner's wife by a former marriage. He alleged that since September 5, 1952 the minor, who is over 18 years old, has lived with him, a father-son relationship having developed between them, which still lasts, and stated his desire to provide him with an education and to protect him. After the proper proceedings—notice of petition served on the biological father by edicts since his whereabouts were unknown, and the transfer of the petition to

the Division of Public Welfare for the corresponding investigation—a stipulation signed by petitioner's attorney and the district attorney was submitted mainly for the purpose of clarifying certain facts in relation to Rachiell's residence. In its pertinent part it says:

"6. That petitioner is an active member of the Navy of the United States of America where he has served 22 years and for the last 20 months he is stationed in Fort Allen, Ponce, Puerto Rico, exclusively on account of his military service.

"7. That petitioner has chosen the Navy as his career by vocation, and he loves the discipline of the military service in the Navy.

"8. That petitioner has been in Puerto Rico on prior occasions and in 1959 he requested his superiors to transfer him to Puerto Rico because he liked the island and found its environment suitable to live with his wife and his children, for which reason his stay in Puerto Rico at the present time is voluntary and the order of transfer to Puerto Rico issued by his superiors coincides with his desire to live in this island."

Order was entered denying the authority requested, in which the trial court states that although the other requisites of the law have been met and the report of the Division of Public Welfare is favorable, petitioner does not comply with the residence requirement of § 130 of the Civil Code, 31 L.P.R.A. § 531, *which requisite is jurisdictional.* Its reasoning is contained in the following paragraphs:

"Our Supreme Court has decided that a Sergeant of the United States Army who lives in Puerto Rico because he was sent to the Island as a member of the armed forces stationed here does not acquire the necessary legal residence to bring an action of divorce in our courts. This principle has not been overruled and by analogy it must be applied to the situation at bar.

"Since, according to the facts, petitioner is in Puerto Rico for the sole reason that he is a member of the United States Navy, the court understands that he has not acquired the necessary legal residence to bring this action."

Undoubtedly, the trial court alludes to the opinion rendered in *Foss* v. *Ferris*, 63 P.R.R. 547 (1944), in which we decided that the provision of § 97 of the Civil Code, 31 L.P.R.A. § 331, which indicates that plaintiff must have resided in the Island for one full year immediately preceding the action, unless the act on which the suit is based has been committed in Puerto Rico or while one of the parties to the marriage resided here, refers to a requisite of domicile which presupposes the intention of establishing his permanent residence and actually stays here for that purpose, *animus manendi*. We added that a member of the armed forces who in the discharge of official orders is transferred to the Island, does not acquire legal residence for the mere fact of living in a military post situated within our territorial limits, but that such situation is rather the accidental residence of a transient and not the one required by said § 97, which is essential for filing an action of divorce.[1] However, later, in *Green* v. *Green*, 87 P.R.R. 797 (1963) we slackened the strictness of the aforestated rule and although we acknowledged that generally members of the armed forces retain the domicile of the place where they join the Army if they had established their domicile there, we admitted the possibility that, where certain special circumstances are present, a member of the armed forces may establish his domicile in the place where he is on duty, whenever the intention is genuinely and objectively demonstrated.[2]

■ 1—The institution of adoption in Puerto Rico is of Roman ancestry. Although, as we shall see, its present meaning and bases are different, originally it responded to the

---

[1] The scope of the opinion in *Foss* v. *Ferris*, *supra*, in relation to actions of divorce, was reexamined and explained in *Mestre* v. *Pabeyón*, 84 P.R.R. 356 (1962). See, also, *González* v. *Santiago*, 84 P.R.R. 366 (1962).

[2] Among other examples we pointed out the fact of living away from the post without it being a requisite of the military authorities; the acquisition of real property; and the exercise of the right to vote.

interest of insuring the perpetuity in the families and on many occasions it served purely political purposes as that of transmitting the imperial dignity to the chosen one. In the Partidas it was known as "father by adoption" but in the course of time, and it was thus received from Spain, it came to serve the purpose of creating, through legal fiction, analogous relations to those of legitimate filiation. As far as we know, questions of domicile of the interested persons were not regarded important and much less were they regarded as a jurisdictional requisite.

The right of adoption was unknown to the common law; hence, in the absence of a legislative expression, the courts assumed attributions controlling the determination of the jurisdictional base in adoption actions. The concept of domicile predominant in other areas of the family law became the accepted view in this institution, and at the beginning the requisite of common domicile of all the interested parties— the adoptive parents, the child, and his natural parents— was applied in full force. But the preoccupation produced by the absence of the domiciliary requisite was caused by the willingness of other states to recognize the decree of adoption which created a new personal status between certain persons, and which generated certain rights and responsibilities between the parties, especially in relation to succession rights. Taintor, *Adoption in the Conflict of Laws*, U. Pitt. L. Rev. 222 (1954); Restatement, Conflict of Laws § 42; *cf. A v. M*, 180 A.2d 541 (N.J. 1962). The emphasis on the domiciliary requisite, being too severe, began to lose efficacy, especially with the developing concept of comity as relevant considerations. See, Restatement, Conflict of Laws, §§ 142 and 143.

■ The greatest difficulty lies in the dissimilarity in the wording of the jurisdictional provisions of adoption statutes in the different states. "Residence," a requisite used in most adoption codes, is an elastic term, "and should be interpreted

in light of object or purpose of statute in which such term is employed," *McGrath* v. *Stevenson*, 77 P.2d 608 (Wash. 1938). In relation to adoption statutes see *Eggleston* v. *Landrum*, 50 So.2d 364 (Miss. 1951) and *In re Duren*, 200 S.W.2d 343, 350 (Mo. 1947).

However, in the excellent comment *The Inadequacy of Domicile as a Jurisdictional Base in Adoption Proceedings*, 17 Rutgers L. Rev. 761 (1963), it is stated that there has been a trend to an effective intervention of the welfare agencies in adoption proceedings to amply guarantee the child's welfare as the determining factor in the judicial determination of the convenience to create a new juridical nexus. It is insinuated that this active participation of the welfare agencies, sort of delegation of *parens patriae* of the state, has deemphasized the importance of the domicile of any of the parties as a purely jurisdictional requisite, and it mentions eight states which practically have abolished it as such in their legislation[3] and six others where they have reached identical results by judicial construction.[4] Particularly interesting is the New York statute, which calls for residence of the adoptive parents and six months residence of the minor in their home. N.Y. Dom. Rel. § 112(2) and (4), and these provisions have been construed in the sense that they do not refer to domicile. Brosman, *The Laws of Adoption*, 22 Colum. L. Rev. 332 (1922).

■ The modern trend in the United States departs from the concept of unity of domicile as the jurisdictional base for adoption, understanding that it involves an excessively subjective attitude. On the other hand it is argued that the mere physical presence during a specified period of time, independent of the specific intent of the interested persons,

---

[3] Alaska, Arkansas, Kentucky, Maine, Minnesota, Tennessee, Washington, and the District of Columbia.

[4] Iowa, Missouri, New Mexico, New York, Pennsylvania, and Wisconsin.

provides a more reliable base to facilitate the function of the investigating machinery for determining whether the objectives sought by the adoption are achieved: the protection of the child. Undoubtedly this psychological approach, contrary to the traditional approach, is better adapted to the present needs and effectively achieves the strengthening of the family institution. Merrill, *Toward Uniformity in Adoption Law*, 40 Iowa L. Rev. 299 (1955), Newbold, *Jurisdictional and Social Aspects of Adoption*, 11 Minn. L. Rev. 605 (1927).

Let us see our statute.

2—It is advisable to point out that it was not until the enactment of Act No. 86 of June 15, 1953 (Sess. Laws, p. 304) that among the qualifications provided for the adopter by § 130 of the Civil Code, 31 L.P.R.A. § 531, the Legislature incorporated the requirement that he must have resided in Puerto Rico for at least six months prior to the date on which the petition for adoption is filed in the corresponding court. Until then, and even since the legislation in force prior to 1902—§ 173 of the Spanish Civil Code, which was extended to the overseas islands by the Royal Decree of July 24, 1889 —it kept silent on this particular. Even the judicial intervention for the authorization was limited to seeing to the compliance with certain requisites in the adoption deed, §§ 612, 613 of the Code of Civil Procedure.[5]

Now then, this residence provision cannot be construed isolatedly or literally. Its scope must be established taking into consideration that it is part of a reform resulting from a new approach on adoption and which is mainly characterized by the departure from the classic concept that it is a private contract and by the establishment of an active inter-

---

[5] Our statute substantially departed from the procedure of authorization of the adoption and the arrogation prescribed by §§ 1825 to 1832 of the Spanish Law of Civil Procedure. (Medina and Marañón, II *Leyes Civiles de España* 500–501).

vention on the part of the state through the appropriate agencies to safeguard the interest of the family and especially that of the adoptee.[6] Hence, the execution of the deed is omitted and substituted by a judicial proceeding. This reform is expressed in Act No. 85 of June 15, 1953 (Sess. Laws, p. 298), which amended §§ 612 and 613 of the Code of Civil Procedure, 32 L.P.R.A. §§ 2691 and 2692 and added §§ 613A to 613F, 32 L.P.R.A. §§ 2693 to 2698.[7] It should be noted that the cardinal objective is derived from § 612: "The application shall contain all such statements as may serve as a basis for determining *the convenience of the adoption. . . .*"

█ All these provisions having been examined[8] as a whole it is evident that the sole purpose of the residence require-

---

[6] Precisely,·House Bill No. 795, which later became Act No. 86, contained a statement of motives which enumerated its purposes as follows. (II-2 Journal of Proceedings 1291):

"(A) To protect the child by preventing his separation from his parents when, with the proper orientation and help, they could provide him with a good home. To prevent persons who are incompetent to assume the responsibility of rearing and educating children, from adopting them; to prevent also, due to deficiencies in the adoption procedure, the natural parents from intervening with the adoptee and hinder his adaptation in the adoptive home.

"(B) To protect the natural parents by giving them the proper orientation and safeguarding them from hasty decisions or under the pressure of problems or situations which they could be helped to solve.

"(C) To protect the adoptive parents by offering them information on all the factors determining the capacity of the child for physical and mental development, guaranteeing them that the natural parents or other relatives of the adoptee may not intervene with them or successfully institute any claim whatsoever over the child they relinquished for adoption since the termination of parental duties and rights of the natural parents or other relatives was settled in the proper proceeding."

[7] These new provisions substantially follow the uniform law of adoption, which may be found in 40 Iowa Law Rev. 329 (1955).

[8] "Section 613.—If the person to be adopted is a minor, the Court shall direct that through the Public Welfare dependency an investigation be made of all the facts adduced in the application and of the other circumstances concurring in the case. The secretary of the Court shall serve on the Public Welfare dependency notice of the order with a copy of the application within the five days following the date on which the same was issued. The Public Welfare dependency shall transmit to the Court a

ment is to facilitate the investigation that must be made by the Public Welfare dependency on the qualifications of the petitioners, the child and the natural parents, and other circumstances concurring in the application. Otherwise the effective supervision which the state has taken upon itself in the interest of the family might be defeated. This being so, we cannot attribute to the residence requirement the content of domicile, but of mere physical presence. *Heirich* v. *Howe*, 171 P.2d 312 (N.M. 1946).

As we previously pointed out, most of the preoccupation of the supporters of the strict interpretation of the term domicile refers to the extraterritorial recognition that may be accorded to adoption decrees. As we already said, the principle of comity or courtesy prevails at present. Precisely, our legislator took steps intended to achieve a harmonious relation with other jurisdictions through the appropriate amendment of the Vital Statistics Registry Act.[9]

---

written report within a term not exceeding sixty (60) days, unless the Court, for just cause, shall extend such term."

"Section 613B.—For the purpose of determining whether the adoption is advantageous to the minor, the Court may grant the petitioner the temporary custody of the minor for a period of from six months to one year, under observation of the Public Welfare dependency. This period may be reduced, increased, or revoked if the circumstances so justify. Upon expiration of the period for the temporary custody of the minor, and after the final report of the Public Welfare dependency has been filed, the Court may authorize the adoption. In case the adoption is denied, should the minor have no father, mother, or guardian, the Court shall provide for the custody and guardianship of the minor."

[9] Act No. 84 of June 15, 1953 (Sess. Laws, p. 296) added §§ 21A to 21D to the Vital Statistics Registry Act. Sections 21C and 21D concerning comity, read:

"Section 21C.—Any adoption made outside of Puerto Rico of a person born in Puerto Rico shall, at the request of an interested party, be recorded in the Vital Statistics Registry upon previous presentation of an authenticated copy of the decision or decree authorizing the adoption, following the same procedure set forth in the preceding section. If said decision or decree does not show all the circumstances necessary for the registration, the interested party shall complete it by means of an affidavit which shall be attached to the other documents.

"Section 21D.—In case the adoptee was born outside of Puerto Rico,

3—Lastly, the analogy sought to be established of the domiciliary requirement between the divorce action and the adoption proceedings is fictitious. In the Comment previously cited *The Inadequacy of Domicile as a Jurisdictional Base in Adoption Proceedings*, 17 Rutgers L. Rev. 761, 785–786 (1963), this aspect of the question is discussed so persuasively and peerlessly that we copy it in its entirety in the present opinion. It says:

"The proponents of domicile may advance their argument by analogy to legitimation and divorce in which domicile has been followed as a necessary sub-Constitutional requisite for proceeding on the merits. Initially, key divorce cases laud domicile, as it *'implies* a nexus between person and place of such permanence as to control the creation of legal relations and responsibilities of the utmost significance.' Tradition is relied upon rather heavily in the divorce field. 'So deeply has it been thought that the responsibility for divorce was that of the domicile,' that this approach has transcended any real or supposed change in social concepts. Also entwined within the divorce analogy is the due process argument, which is relied upon by advocates of domiciliary requirements.[10]

"Yet, there are certain factors present within divorce proceedings that detract from its facility as an apt analogy. For example, the disintegration of family life is a symptom of social illness that has alarmed many. The reluctance to grant *easy* divorces has been in part a reaction to this considered social ill. But, adoption creates family relationships; adoption has something to offer by way of stability and social health, factors promoting the welfare of the state and promoting the interests

---

but was adopted in Puerto Rico, it shall be the duty of the Chief of the Bureau of Registry and Vital Statistics of the Department of Health to transmit to the proper officer of the adoptee's birth place, a certified copy of the decision issued by the court in the adoption case.

"The Vital Statistics Registry shall keep a special registry for the registration of adoptions of persons born outside of Puerto Rico and adopted in Puerto Rico."

[10] Due process in adoption proceedings is met in Puerto Rico by a provision that requires the serving of notice and permits the appearance of the natural parents of the minor, who are sought to be deprived of the patria potestas and custody of the minor.

of children. Thus, the desire to facilitate a full review of the merits of an adoption action is present, while the attempt to strictly limit divorce proceedings is actively contra.

"The *significant* dissimilarities among the states as to the substantive grounds for divorce are factors not present in the field of adoption. Thus, divorce has a significant element not present in adoption, and this element does not as easily facilitate the application of the concept of comity." (Italics of author.)

For the reasons stated, the judgment rendered by the Superior Court, Ponce Part, on September 23, 1964 will be reversed and the case remanded for further proceedings.